IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| **Professional Services Plaza**, *et al.*, | § | |
| | § | Case No. 15-50024 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |

## DEBTORS' JOINT SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN

Debtors, PROFESSIONAL SERVICES PLAZA ("PSP") and JOSE SALVADOR TELLEZ ("Tellez") (collectively "Debtors" and/or "Reorganized Debtors") present their Joint Second Amended Combined Disclosure Statement and Plan to the holders of Impaired Claims against Debtors, pursuant to Section 1125 of Title 11 of the United States Bankruptcy Code.  On March 2, 2015, Debtors filed for protection under Chapter 11 of the Bankruptcy Code.  On April 13, 2015, the cases were ordered to be jointly administered.  Both PSP and Tellez have continued to operate their businesses as debtors-in-possession.

## I.      INTRODUCTION

### *The Disclosure Statement and Plan*

Debtors are presenting this document in furtherance of their attempt to restructure their businesses affairs.  It is the intention of both PSP and Tellez to continue operating their businesses and pay their creditors in accordance with this Joint Plan of Reorganization.

This Joint Second Amended Combined Disclosure Statement and Plan has been filed for the Court's consideration and approval.  Debtors have simultaneously filed a motion seeking conditional approval of the Disclosure Statement.  Once given such approval, this Joint Second Amended Combined Disclosure Statement and Plan will be sent to all holders of Impaired Claims to provide adequate information to those Creditors who are entitled to vote on the Plan so that they can make an informed decision about whether to accept or reject the Plan.  Those Creditors who are entitled to vote on the Plan should read this document carefully and in its

entirety before voting on the Plan.

## II.     LIMITATIONS ON INFORMATION PROVIDED IN THIS DOCUMENT

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN INDEPENDENTLY AUDITED. THE RECORDS KEPT BY DEBTORS RELY FOR THEIR ACCURACY ON BOOKKEEPING PERFORMED BOTH INTERNALLY AND BY OUTSIDE SERVICES. FOR THIS REASON, DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS CORRECT, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO BE ACCURATE.

## III.     HISTORY OF THE DEBTORS

In 1989, Tellez, Jose Vela, Jr. ("Vela"), Eustorgio Perez ("Perez"), and Jorge O. Gutierrez ("Gutierrez") (collectively, the "Original Partners") decided to purchase from Beatriz Azios and Jose M. Azios, *via* owner financing, the office complex in which they each had their respective professional offices, which said complex is located at Lots 1 and 3, Block 231, Western Division, Laredo, Webb County, Texas, commonly known as 1102 Scott Street, Laredo, Texas  78040 (the "Office Complex" or "Subject Property").  Moreover, the Original Partners further agreed that they would hold and operate the real property collectively pursuant to a partnership they established and named "Professional Services Plaza" ("PSP").  More specifically, the Original Partners agreed that PSP would have all rights, duties, and obligations as would the legal owner of the real property and that PSP would collect all rents generated by the improvements on real property, pay all expenses, including mortgage debt service, and that the partners would share in PSP's profits, losses and/or capital contributions, if any. In furtherance of the agreement made by the Original Partners, on or about June 6, 1989, Mr. and Mrs. Azios conveyed the Subject Property to the Original Partners.  Due to inadvertence and/or lack of diligence, the title to the Subject Property was put in the names of the Original Partners, in undivided interests, instead of PSP.  Nevertheless, the Original Partners and subsequently the Current Partners separately and collectively agreed that their intention has always been that PSP should have all right, title, and interest as the owner of the Subject Property and they have generally acted in accordance with such intention.  Importantly, except for the execution of certain financing instruments, PSP has exercised all rights and assumed all duties as the owner of the Subject Property and all of the Original Partners and Current Partners have honored and

acknowledged the status of PSP as owner of the Subject Property and their status as general partners in PSP.   In this regard, PSP has had full use, enjoyment, and benefit of the Subject Property, negotiated, drafted, and executed leases with tenants, collected revenues, made repairs and other expenditures, and from its own checking account, has paid for debts, including debt service on the mortgage loan held by CFS.

After closing on the purchase of the Subject Property from Mr. and Mrs. Azios, the Original Partners continued working from their respective professional offices at the Office Complex.   As mentioned above, PSP paid the expenses and liabilities of the real property, including all maintenance, repairs, loans, and ad valorem taxes.  To accommodate the growth of their respective professional practices, the Original Partners agreed to refinance the debt and expand the Office Complex to build a second story and add approximately 8,500 square feet. Once again, they agreed that PSP would pay the debt service and other expenses from the rent that PSP would collect from them and the additional non-partner tenants who would occupy the new office space.  In furtherance of the foregoing, on or about November 19, 1989, the Original Partners obtained a refinancing loan from International Bank of Commerce.  With those loan proceeds, the expansion of the Office Complex was completed on or about June 19, 1991. Incidentally, on or about January 1990, PSP received an E.I.N. from the I.R.S.   Also, on or about October 9, 1996, the Original Partners filed with the Webb County Clerk an Assumed Name Certificate for PSP.

On May 18, 1999, Gutierrez offered to sell his PSP interest to the other Original Partners. On June 24, 1999, Tellez, Vela, and Perez accepted Gutierrez' offer.   Unfortunately, due to a disagreement, the closing on this transaction was delayed.   Moreover, during this initial delay, Vela died.  As a result, on or about November 11, 1999, Jose Vela, III ("Vela III") acquired Vela's interest.  Thereafter, on or about February 24, 2000, Tellez, Perez, and Vela III (the "Current Partners") used a refinance of the existing loans with South Texas National Bank to acquire Gutierrez' PSP interest.  Incidentally, on or about January 2001, the Office Complex sustained some fire damage.  Subsequently, on or about November 2001, the damage was repaired and the Office Complex was refurbished.

Between 1989 and 2009, PSP collected revenues generated by the Subject Property, however, such revenues were not as high as they should have been for the market in which it is located.  Nevertheless, PSP's financial condition was stable and the value of the Subject Property increased substantially.  During this period of time, PSP was able to pay from its own bank accounts all of the operating expenses and debt service.  Significantly, on October 21, 2009, the Current Partners obtained a refinance loan from Compass Bank and from these proceeds distributed to themselves some of the equity in the Office Complex.

Tellez was admitted to practice law in the: (i) State of Indiana on October 15, 1982; (ii) State of Illinois on November 4, 1988; and (iii) State of Texas on May 10, 1985.  Tellez was also admitted in the: (i) U.S. District Court for the Northern District of Indiana on October 15, 1982; (ii) U.S. District Court for the Southern District of Texas on January 12, 1984; (iii) U.S. Court of Appeals for the 5th Circuit on June 10, 1985; and (iv) Supreme Court of the United States on November 17, 2003.

Since 1985 to the present, Tellez has been a solo practitioner specializing in Immigration and Nationality Law, Federal Criminal Defense, and Civil Litigation.

IV.      **EVENTS LEADING TO BANKRUPTCY**

In 2013, PSP lost its largest tenant, the Webb County Public Defender's Office, which had been occupying about one-fourth of Office Complex.   Around the same time, other tenants, including Perez, began to default on their rent obligations.  For the foregoing reasons, on or about August 2013, PSP struggled to make debt service payments to Compass Bank and its successor, CFS Allocation Solutions, L.L.C. ("CFS").  Consequently, CFS attempted to foreclose on the Subject Property on December 2, 2014, but such foreclosure was enjoined when Tellez filed suit against CFS and the Court entered a Temporary Restraining Order.  Tellez' lawsuit was dismissed pursuant to a forbearance agreement entered between CFS and the Current Partners.

Unfortunately, PSP continued to struggle and was unable to make the payments required by the forbearance agreement.  Again, CFS attempted for foreclose on the Subject Property but the foreclosure was stopped on March 2, 2015, when PSP and Tellez filed for protection under Chapter 11 of the Bankruptcy Code.  In this connection, Tellez personally filed for bankruptcy protection because CFS refused to recognize the existence of the PSP partnership or PSP's equitable interest in the Subject Property.

### V.    OPERATIONS IN BANKRUPTCY

Debtors have continued to operate their respective businesses as debtors-in-possession during the pendency of their respective Chapter 11 cases.  As required to under Chapter 11 cases, Debtors have filed their respective monthly operating reports and paid their respective trustee's fees.  Debtors have also negotiated for and obtain permission to use of CFS' cash collateral on interim bases.  CFS has filed a motion requesting adequate protection and motion for relief from the automatic stay.  These motions are currently scheduled for hearing on February 26, 2016 PSP has retained, and intends to continue retaining, Tellez as its managing partner because of his experience, contacts, and proven record of commitment of substantial time and resources.

### VI.    ANALYSIS AND EVALUATION OF PROPERTY

Attached hereto **as Exhibit "A"** is a listing of Debtors' assets showing their fair market and liquidation values.  Debtors' assets are as follow:

#### A.  *Real Property*

*PSP*

Although the following property is titled under the Current Partners, each of whom hold a 1/3 undivided interest as title holders, PSP and Tellez contend that PSP is the equitable owner of the following property for the reasons stated in Section III-History of the Debtors:

1. Lots 1 and 3, Block 231, WD, Laredo, Webb County, Texas, also known as 1102 Scott Street, Laredo, Texas 78041, which Debtors estimate the value to be $847,000.00.

*Tellez*

Tellez believes that PSP has an equitable interest in the Subject Property listed above and, as such, the Subject Property is part of the Estate of PSP.  However, to the extent that the Court ultimately finds otherwise, then in the alternative, Tellez owns the following real property interest:

1. An undivided one-third (1/3) interest in Lots 1 and 3, Block 231, WD, Laredo, Webb County, Texas, also known as 1102 Scott Street, Laredo, Texas 78041, and  Tellez estimates the value of his 1/3 interest is $282,333.33.

**B.  Personal Property:**

*PSP*

PSP's personal property consists of the following:

1. Cash on Hand in the amount of $5,070.65 as of February 25, 2016.

2.  Accounts Receivable in the aggregate amount of $41,018.53 as of February 25, 2016

3. (1) Desk; (1) Table (10) Chairs; (2) Coolers; and a Telephone System, which PSP estimates the value to be $1,500.00;

*Tellez*

Tellez' non-exempt personal property consists of the following:

6

1. Cash on Hand in the amount of $15,573.73 as of February 25, 2016.

2. To the extent that the Court finds that PSP does not have an equitable interest in the Subject Property, then Tellez owns a 1/3 partnership interest in PSP, which Tellez estimates the value of which to be $282,333.33.

3. State Bar Licenses, which Tellez estimates the value to be $0.00.

4. 2005 Ford F-150, which Tellez estimates the value to be $5,904.00.

5. 1997 Chevrolet Camaro, which Tellez estimates the value to be $3,705.00.

6. Sole Proprietor Law Practice, which Tellez estimates the value to be $175,529.50, based on the Earnings Multiple Method.

The liquidation values of the above-listed real estate and other personal property, listed in **Exhibit A**, are discounted either from the cost when appropriate, or from the Debtors' opinion of value.

*C.*    ***Debtors' Financial Data***:  Debtors and their attorney have reviewed the pertinent financial data and have formulated a proposed 2016 Budget.  See **Exhibit "B".**  A Combined Cash Flow Statement/Cumulative Plan Summary, which details the available cash, estimated expenses, cash requirements for a twelve month period beginning in March 2016, and the cash available for distribution on the Effective Date, has also been developed and is attached hereto as **Exhibit "C."**

**VII.**    **THE PLAN CONFIRMATION PROCESS**

*A.  Solicitation of Plan*

Because the Court has conditionally approved the Disclosure Statement contained herein, Debtors are forwarding this Joint Combined Disclosure Statement and Plan to their creditors and other parties-in-interest together with a Ballot and the Court's Order Conditionally Approving Disclosure Statement, Giving Notice of Confirmation Hearing, Setting Certain Deadlines and

Providing for Other Matters Concerning Confirmation of the Plan.  A creditor or any party-in-interest may file an objection to confirmation of the Plan within the time prescribed by the Court.

### B.  Voting Rights and Requirements

Any Creditor who holds an Allowed, Impaired Claim, is entitled to vote to accept or reject the Plan.  The failure by any creditor to submit a ballot may be deemed as a vote accepting the Plan.  A ballot to be used to vote for or against the Plan, together with a postage-prepaid return envelope, will be enclosed with this Joint Amended Combined Disclosure Statement and Plan.  In order for a ballot to be counted it must be completed and returned by the date and time specified in the Court's Order to:

**ADOLFO CAMPERO, JR.**
**315 Calle Del Norte, Suite 207**
**Laredo, Texas 78041**

### C.  Vote Required for Class Acceptance

The Bankruptcy Code provides that an Impaired Class of Claims has accepted the Plan if the holders of allowed Claims in the Class casting votes in favor of the Plan (1) hold at least two-thirds of the total amount of the Allowed Claims of the holders of such class who vote on the Plan and (2) constitute more than one-half in number of all holders of Allowed Claims in such class who vote on the Plan.

### D.  Confirmation Hearing (The Court May Approve This Plan and Limit Creditors' Legal Rights)

The Court will consider only written objections and ballots that are timely filed.  If no objections are filed (or if all objections are overruled by the Court) and if at least one class of creditors accepts the Plan, the Court may approve the Plan.  If the Court approves the Plan, all creditors will be bound, even if a Creditor did not vote and even if a Creditor voted against the Plan.  This may mean that the Creditor will not be allowed to collect its claim against Debtors, except as provided in this Plan.

### E.  General Provisions Applicable to All Claims of Creditors

Pursuant to Section 506 of the Bankruptcy Code and Bankruptcy Rule 3012, the Court shall determine the value of any claim secured by a lien on property in which the estate has an interest at the confirmation hearing set on the Plan or prior to that time pursuant to a motion filed by the Debtors to value the property pursuant to 11 U.S.C. §506.  The claim shall be secured to the extent of the value of the collateral as determined by the Court, and unsecured for the balance, if any.  For purpose of voting on the Plan of Reorganization, the Court shall estimate any claim when requested to do so at the hearing on plan confirmation if a valuation hearing has not already been held.

### VIII.  DEBTORS' PLAN FOR PAYMENT OF THEIR DEBTS/IMPLEMENTATION OF THE PLAN

A.  The rents generated from the Subject Property will be used to pay for the: (i) monthly installments due CFS under Class 1; (ii) monthly escrow installments due CFS under Class 1; (iii) payments of ad valorem taxes called for under Class 2 through 5; (iv) payments due to PSP's unsecured creditors under Class 12; (v) payment of all future ad valorem taxes; (vi) payment of utilities; and (vii) payment of maintenance and repairs necessary to upkeep the Subject Property.  In the event that the rents are insufficient to cover the foregoing expenditures, then the Current Owners will infuse the necessary funds to cover for such expenditures, and Tellez will provide Vela and Perez a monthly rent roll and a monthly collection report of rents.  Tellez, however, will pay his personal debts provided under Classes 6 through 11 with the funds generated by his law practice.

B.  The Confirmation Date shall be the date upon which the Order of Confirmation is entered by the Court.

C.  The Effective Date shall be 30 days following the Confirmation Date.

D.      Pursuant to the agreement reached between Debtors, Vella III, Perez, and CFS,

9

title will remain under the Current Owners and PSP hereby acknowledges that PSP does not own, nor did it ever own, any interest, whether legal, equitable, in personam, in rem, or otherwise, in the Subject Property.  As a result, the Current Owners will preserve their undivided 1/3 interest in the Subject Property less the adjustments provided under Subsection E.  Although PSP has no interest in the Subject Property, PSP may manage the Subject Property post-confirmation under a management agreement and will only be able to enter into lease agreements on behalf, and in the name, of the Current Owners. For the avoidance of doubt, PSP shall not enter into any lease agreements regarding the Subject Property in the name of PSP.

E.      The Current Owners have agreed to start marketing the Subject Property on the Effective Date.  Accordingly, Tellez shall market the Subject Property on the Effective Date.  In the event that the Current Owners are not able to agree to sales price of the Subject Property and/or the value of the Current Owners equity in the Subject Property, the Current Owners have agreed to file a motion with the Bankruptcy Court to determine that reasonable sales price of the property and/or the equity of the Current Owners in the Subject Property.  In the event that the rental income is not sufficient to satisfy the following expenses, the Current Owners have also agreed to make the necessary contributions necessary to: (i) make the adequate protection and escrow payments during the pendency of these cases; (ii) make the monthly installments due CFS under Class 1; (iii) make the monthly escrow installments due CFS under Class 1; (iv) make the payments of ad valorem taxes called for under Class 2 through 5; (v) payments due to PSP's unsecured creditors under Class 12; (vi) make the payments all future ad valorem taxes; (vii) make the utilities payments; (viii) to pay any maintenance and repairs necessary to upkeep the Subject Property; and (ix) pay on the Effective Date the administrative fees incurred during the pendency of these cases.  Regarding the administrative fees/attorney's fees, the Current Owners agree that 2/3rds shall be to PSP and 1/3rd to Tellez.  The Current Owners have also agreed that the contributions identified herein that are not made, as necessary, shall be reduced, plus 5% interest per annum, from their equity in the Subject Property.  However, Tellez may apply his contributions made during the pendency of this case for the escrow payments to his portion of the 2015 ad valorem taxes.  Should the rental income be used to pay Classes 2 through 5, the Current Partners agree that Vela's equity account shall be credit 1/3 of any amount paid to Classes 2 through 5.

IX.     **WHAT ABOUT THE SECURED CREDITORS?**

The Secured Creditors will retain their liens or security interest to the extent of their allowed claim as provided herein.

X.     **CLAIMS**

*Treatment of Administrative Claims*

The Administrative Expenses of these Chapter 11 cases are to be paid in full on the Effective Date, except for the administrative claim of the IRS which will be included in the Class 6 pursuant to an agreement reached between the IRS and Tellez.  These expenses include all the administrative claims of the Debtors that have accrued post-petition. The anticipated administrative expense holders are as follows:

| | |
|---|---|
| Attorneys' fees, estimated to be: | $40,000.00 |
| Court Costs & U.S. Trustee Fees: | $  1,000.00 |
| IRS Administrative Claim (Tellez): | $  1,552.56 |
| Appraisal Fees (PSP): | $  5,000.00 |

*Treatment of Creditors Secured by the Subject Property*

**CLASS 1.   Secured Claim of CFS Allocation Solutions III ("CFS") (Secured in relation to Tellez Debtor)**

CFS has an allowed claim in the amount of $425,842.34, as of the Effective Date, secured by Lots 1 and 3, Block 231, WD, Laredo, Webb County, Texas, also known as 1102 Scott Street, Laredo, Texas 78041.  CFS' claim shall bear interest at a rate of 5.0% per annum through the Effective Date.  CFS' claim shall be amortized over 20 years at 5.0% with a balloon payment in 4 years following the Effective Date.  Commencing on the Effective Date, CFS' claim shall be paid in 47 monthly installments of $2,810.00, including interest at 5.0%, and a balloon payment on the 48th month.

In addition to the monthly installments, commencing on the Effective Date, CFS shall receive monthly escrow installments in an amount equivalent to 1/12 of the preceding year's total ad valorem tax and insurance obligations.

Furthermore, in the event that the Debtors, Vela or Perez file a subsequent petition under title 11 of the United States Code or under any other similar federal or state law, the Debtors, Vela and Perez unconditionally and irrevocably consent to relief from the automatic stay so as to allow CFS to exercise its rights and remedies under its loan documents with respect to its collateral, which includes but is not limited to the Subject Property, including taking possession of the Subject Property, collecting rents, foreclosing its mortgage lien or otherwise exercising its rights and remedies with respect to its collateral.   In such event, the Debtors, Vela and Perez agree that they shall not, in any manner, oppose or otherwise delay any motion filed by CFS for relief from the automatic stay

This Class is Impaired.

**CLASS 2.  <u>Secured Claim of City of Laredo ("COL")</u>**

COL has tax claims for the years 2013, 2014, and 2015 in the aggregated amount of $9,744.90, which is secured by Lots 1 and 3, Block 231, WD, Laredo, Webb County, Texas, also known as 1102 Scott Street, Laredo, Texas 78041.

COL's tax claims for the years 2013 and 2014 in the aggregated amount of $6,321.09 shall be paid in 48 monthly installments of $116.00, including 12% interest, commencing on the Effective Date.  This Class is Unimpaired.

COL's tax claim for the year 2015 in the amount of $3,423.81 shall be paid on the Effective Date.

This Class is Unimpaired.

**CLASS 3.  <u>Secured Claim of Webb County ("WC")</u>**

WC has tax claims for the years 2010, 2011, 2012, 2013, 2014, and 2015 in the aggregated amount of $11,296.62, which is secured by Lots 1 and 3, Block 231, WD, Laredo, Webb County, Texas, also known as 1102 Scott Street, Laredo, Texas 78041.

WC's tax claims for the years 2010, 2011, 2012, 2013, and 2014 in the aggregated amount of $9,112.01 shall be paid in 48 monthly installments of $240.00, including 12% interest, commencing on the Effective Date.  This Class is Unimpaired.

WC's tax claim for the year 2015 in the amount of $2,184.61 shall be paid on the Effective Date.

This Class is Unimpaired.

**CLASS 4.  <u>Secured Claim of Laredo Community College ("LCC")</u>**

LCC has tax claims for the years 2013, 2014, and 2015 in the aggregated amount of $3,639.64, which is secured by Lots 1 and 3, Block 231, WD, Laredo, Webb County, Texas, also known as 1102 Scott Street, Laredo, Texas 78041.

LCC's tax claims for the years 2013 and 2014 in the aggregated amount of $1,864.43 shall be paid in 48 monthly installments of $49.00, including 12% interest, commencing on the Effective Date.

LCC's tax claim for the year 2015 in the amount of $1,775.21 shall be paid on the Effective Date.

This Class is Unimpaired.

**CLASS 5.  Secured Claim of Laredo Independent School District ("LISD")**

LISD has tax claims for the years 2013, 2014, and 2015 in the aggregated amount of $9,147.45, which is secured by Lots 1 and 3, Block 231, WD, Laredo, Webb County, Texas, also known as 1102 Scott Street, Laredo, Texas 78041.

LISD's tax claims for the years 2013 and 2014 in the aggregated amount of $6,647.23 shall be paid in 48monthly installments of $175.00, including 12% interest, commencing on the Effective Date.

LISD's tax claim for the year 2015 in the amount of $2,500.22 shall be paid on the Effective Date.

This Class is Unimpaired.

*Treatment of Tellez Creditors*

**CLASS 6.  Priority Claims of Internal Revenue Service ("IRS")**

IRS has a priority claim in the amount of $66,619.17.  The IRS' priority claim shall be paid in 60 monthly installments of $1,197.00, including interest at 3%, commencing on the Effective Date.

Pursuant to an agreement reached between the IRS and Debtor, the IRS' administrative claim in the amount of $1,552.56 shall be paid in 60 monthly installments of $28.00, including interest at 3%, commencing on the Effective Date. For the avoidance of doubt, any payment

made on the Class 6 Claim shall be made from Debtor Tellez's income and not from rental revenues or proceeds from the Subject Property or from the PSP Debtor.

This Class is Impaired

**CLASS 7.  <u>Secured Claims of Internal Revenue Service ("IRS")</u>**

IRS has a claim in the amount of $67,386.93 secured by Lots 1 and 3, Block 231, WD, Laredo, Webb County, Texas, also known as 1102 Scott Street, Laredo, Texas 78041.  IRS' claim shall be paid in 60 monthly installments of $1,210.85, including interest at 3%, commencing on the Effective Date.  This Class is Impaired

**CLASS 8.  <u>Secured Claims of Toyota Motor Credit Corporation ("TMCC")</u>**

TMCC has a claim in the amount of $6,875.74 secured by 2013 Toyota Yaris.  TMCC's claim shall be paid in 60 monthly installments of $121.06, including interest at 2.18%, commencing on the Effective Date. For the avoidance of doubt, any payment made on the Class 8 Claim shall be made from Debtor Tellez's income and not from rental revenues or proceeds from the Subject Property or from the PSP Debtor.  This Class is Impaired.

**CLASS 9.  <u>Secured Claims of Ally Financial, Inc. ("AFI")</u>**

AFI has a claim in the amount of $5,655.40 secured by 2011 Chevrolet Travers.  AFI's claim shall be paid in 36 monthly installments of $160.00, including interest at 1.36%, commencing on the Effective Date.  For the avoidance of doubt, any payment made on the Class 9 Claim shall be made from Debtor Tellez's income and not from rental revenues or proceeds from the Subject Property or from the PSP Debtor. This class is Impaired

**CLASS 10.       Secured Claim of Green Tree ("GT")**

GT has a claim in the amount of $33,428.32 secured by LOT 1128, BLK 70, DEL MAR SIGNAL HILLS, Webb County, Texas, also known as 808 Surrey Road, Laredo, Webb County, Texas 78041, Tellez's homestead.   GT's claim shall be paid in 60 monthly installments of $644.32, including 5.875% annual interest, commencing on the Effective Date. For the avoidance of doubt, any payment made on the Class 10 Claim shall be made from Debtor Tellez's income and not from rental revenues or proceeds from the Subject Property or from the PSP Debtor.  This Class is Impaired.

*Treatment of PSP and Tellez Unsecured Creditors*

**CLASS 11.       Tellez General Unsecured Creditors**

Commencing on the Effective Date, the allowed unsecured claims identified in Tellez' Schedule F (Docket No. 31) will be paid 100% in 60 monthly installments of $605.36, including interest at 1.49%.  For the avoidance of doubt, any payment made on the Class 11 Claim shall be made from Debtor Tellez's income and not from rental revenues or proceeds from the Subject Property or from the PSP Debtor. This is an Impaired Class.

**CLASS 12.       PSP General Unsecured Creditors**

The allowed unsecured claims identified in PSP's Schedule F (Docket No. 29) will be paid 100% in 60 monthly installments of $145.59.   This is an Impaired Class.

*Treatment of PSP Equity Interest*

**CLASS 13.       EQUITY HOLDERS**

The Current Partners shall retain their interest in PSP; provided, however, that PSP shall

16

have no interest whatsoever, whether legal, equitable, in personam, in rem, or otherwise, in the Subject Property.

## XI.    NOTICES

**Notice 1.**     On the Effective Date, all property of the shall vest in the Reorganizing Debtors and the individual partners, respectively, free and clear of all liens, claims, interest, and charges, arising on or before the confirmation of the Plan, except as provided in this Plan or in the confirmation order, on the condition that the Reorganizing Debtors comply with the terms of this Plan, including the making of all payments to creditors provided for in this Plan. Notwithstanding the foregoing, due to PSP having no interest in the Subject Property, the Subject Property and any other collateral of CFS shall not vest in PSP, but instead the 1/3 interest which Tellez held in the Subject Property pre-petition shall re-vest in Tellez as of the Effective Date.  If a Reorganizing Debtor defaults in performing under the provisions of this Plan and the respective case is converted to a case under Chapter 7 prior to substantial consummation of this Plan, all property vested in the Reorganizing Debtors and all subsequently acquired property owned as of or after the conversion date shall re-vest and constitute property of the bankruptcy estate in the converted case.

**Notice 2.**     All creditors are bound to the provisions of  the confirmed Plan and are bound to the provisions of Section 1141 of the Bankruptcy Code.

**Notice 3.**     PSP shall be discharged from all debts upon the confirmation of this Plan pursuant to the provisions of Chapter 11 of the Code, except as determined by the provisions of this Plan, all claims which are not allowed claims by the Confirmation Date, or by the expiration of any subsequent deadline provided for in this Plan, shall be discharged upon the confirmation of this Plan as provided by the Bankruptcy Code.  Nothing in this Plan shall be construed to prohibit PSP or Tellez from early paying any debt treated under this Plan.  However, Tellez, as an individual Debtor, shall receive a discharge only after all payments pursuant to the Plan have been made.  Nonetheless, Tellez may move the Court, at any time after the confirmation, and after notice and hearing, to issue a discharge pursuant to 11 U.S.C. §1141(d)(5)(B).  As such, Tellez shall be discharged of any debt not set forth in this Plan that arose before confirmation or

prior to the filing of this case so long as all payments pursuant to the Plan have been made

**Notice 4.**        Neither (a) Debtors, their employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by any of the Debtors, their officers, directors, employees and representatives, the Plan Agent or any of his employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional person employed by them, nor (b) each Professional for the Debtors or any of their employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by any of them, (the persons identified in (a) and (b) are collectively referred to as "Protected Persons"), shall have or incur any liability to any Person or Entity under any theory of liability for any act or omission occurring on or after the Petition Date in connection or related to the Debtors, the Chapter 11 Cases, or the Estates, including, but not limited to, (i) formulating, preparing disseminating, implementing, confirming, consummating or administering the Plan (including soliciting acceptances or rejections thereof); or (ii) the disclosure statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken in connection with the Plan, except for acts constituting willful misconduct or gross negligence and in all respects such Protected Persons shall be entitled to rely in good faith upon the advice of counsel. In any action, suit or proceeding by any Person contesting any action by, or non-action of any Protected Person as constituting willful misconduct or gross negligence or not being in good faith, the reasonable attorneys' fees and costs of the prevailing party will be paid by the losing party and as a condition to going forward with such action, suit, or proceeding at the outset thereof, all parties thereto will be required to provide appropriate proof and assurances of their capacity to make such payments of reasonable attorneys' fees and costs in the event they fail to prevail.

**Notice 5.**        All notices required or permitted to be made in accordance with the Plan shall be in writing and shall be delivered personally, by facsimile, or mailed by registered or certified mail, return receipt requested as follows:

To Debtors:                                              To Debtors' Counsel:

Professional Services Plaza                              Adolf Campero, Jr.
P.O. Box 6658                                            315 Calle Del Norte, Ste. 207
Laredo, Texas 78595                                      Laredo, Texas 78041.
                                                         (956) 796-0330-Telephone
Jose Salvador Tellez                                     (956) 796-0399-Facsimile
1102 Scott Street
Laredo, Texas 78040

Jose Vela, III

c/o Carl M. Barto

817 Guadalupe Street

Laredo, Texas 78040


### XI.     ALTERNATIVES TO THIS PLAN

        If the Plan is not confirmed, another party in interest in the case could attempt to formulate
and propose a different plan or plans.  Such plans might, theoretically, involve some other form of
reorganization/liquidation.   Any alternative plan, however, would likely result in additional
administrative expenses to the estate and would provide little or no benefit at all.  The Plan jointly
proposed by the Debtors is straightforward, meets the requirements of Section 1129, and provides
the best outcome for Creditors.  Moreover, liquidation will not maximize the value of the Debtors'
estates.


### XII.    IS THERE A RISK THAT THE PLAN MIGHT NOT SUCCEED?

        There is always a chance that a plan may not succeed, but Debtors feel confident that with
the present operations, the risk is substantially reduced.


### XIII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

        The implementation of the Plan may have significant federal income tax consequences with

respect to the Creditors and the Debtor. The following discussion summarizes such federal income tax consequences based upon the Internal Revenue Code of 1986, as amended (the "Tax Code") and the Treasury Regulations promulgated thereunder.

The Plan and its related tax consequences are complex. Treasury Regulations have not yet been promulgated with respect to many of the substantive provisions of the Tax Code that have been amended by legislation in recent years. The Debtor has not requested a ruling from the Internal Revenue Service, nor has it obtained an opinion of counsel. Accordingly, no assurance can be given as to the interpretation that the Internal Revenue Service will adopt. Further, the federal income tax consequences to any particular Creditor and the Debtor may be affected by matters not discussed below. There also may be state or local tax considerations applicable to each Creditor. THE DISCUSSION SET FORTH BELOW IS INCLUDED FOR GENERAL INFORMATION ONLY. BECAUSE THE TAX CONSEQUENCES OF THE PLAN MAY VARY DEPENDING UPON INDIVIDUAL CIRCUMSTANCES, EACH CREDITOR AND INVESTOR IS URGED TO CONSULT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN UNDER APPLICABLE FEDERAL, STATE, AND LOCAL TAX LAWS.

### A.     *Federal Income Tax Consequences to Creditors*

The federal income tax consequences of the implementation of the Plan to a Creditor will depend in part on whether, for federal income tax purposes, the obligation from which a Creditor's Claim arose constitutes a "security." The determination as to whether an obligation from which a Creditor's Claim arose constitutes a "security" for federal income tax purposes is complex. It depends on the facts and circumstances surrounding the origin and nature of the obligation. Generally, corporate debt obligations evidenced by written instruments with original maturities of ten years or more constitute "securities." Although it appears that most of the Creditors' Claims do not constitute "securities," the Debtor expresses no views with respect to whether the obligation from which a particular Creditor's Claim arose constitutes a "security" for federal income tax purposes. Creditors are urged to consult their own tax advisors in this regard.

Exchanges by Creditors whose claims arise from obligations that do not constitute "securities," or whose claims are for wages or services, will be fully taxable exchanges for federal income tax purposes. Such Creditors who receive solely cash in discharge of their Claims, will

recognize gain or loss, as the case may be, equal to the difference between (i) the amount realized by the Creditor in respect of its Claim (other than any Claim for accrued interest) and (ii) the Creditor's tax basis in its Claim (other than any Claim for accrued interest).  For federal income tax purposes, the "amount realized" by a Creditor who receives solely cash in discharge of its Claim will be the amount of cash received by such Creditor.

Where gain or loss is recognized by a Creditor, the character of such gain or loss as a long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Creditor, whether the obligation from which a claim arose has been held for more than six months, and whether and to what extent the Creditor has previously claimed a bad debt deduction.  The capital gains deduction for individuals and the alternate tax for corporate net capital gain has been repealed and capital gain is currently taxed to individuals and corporations at their respective maximum tax rates.  However, the definitions of long-term and short-term capital gain or loss have not been repealed.

To the extent any amount received (whether cash or other property) by a Creditor is received in discharge of interest accrued on its Claim during its holding period, such amount will be taxable to the Creditor as interest income (if not previously included in the Creditor's gross income).  Conversely, a Creditor will recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent any interest accrued on its Claim was previously included in the Creditor's gross income and is not paid in full.

### XIV.   CREDITORS' REMEDIES ON DEFAULT

#### A.   *General Provision*

A failure by a Reorganizing Debtor to make payments to a creditor pursuant to the terms of the Plan shall be an Event of Default.  If a Reorganizing Debtor fails to cure an Event of default of a written notice of default within thirty (30) calendar days after service of such written notice from a creditor, the creditor may (a) enforce the entire amount of its claim, (b) exercise any and all right and remedies under applicable non-bankruptcy law, and (c) seek such relief as

may be appropriate in this court. Written notice shall be in accordance with the provision of "Notice 5" above.

The Reorganizing Debtor in default may cure only four (4) Events of Default. Immediately upon a fifth (5th) Event of Default, without further notice, a creditor may (a) enforce the entire amount of its claim, (b) exercise any and all rights and remedies under applicable non-bankruptcy law, and (c) seek relief as may be appropriate in this court.

### B. Internal Revenue Service Provision

With respect to the Internal Revenue Service ("IRS"), a failure by a Reorganizing Debtor to make a payment to the IRS pursuant to the terms of the Plan shall be an Event of Default; as to the IRS, there is an Event of Default if payment is not received by the fifteenth (15th) day of each month; if there is a default as to the IRS, IRS must send written demand for payment to the Reorganizing Debtor in default and said payment must be received by the IRS within fifteen (15) days of the date of the demand letter; the Reorganizing Debtor in default can receive up to five (5) notices of default from the IRS, the sixth (6th) default cannot be cured and the IRS may accelerate its allowed claim(s), past and future, and declare the outstanding amount of such claim(s) to be immediately due and owing and pursue any and all available state and federal rights and remedies with respect to the Reorganizing Debtor in default.  These default provisions pertain to the entire claim(s) of the IRS, secured, unsecured priority and unsecured general.

The IRS is bound by provisions of the confirmed plan and is barred under 11 U.S.C. §1141 from taking any collection action against the Reorganizing Debtor for prepetition claims during the duration of the plan (provided there is not an uncured default as to the IRS).  The period of limitations on collection remains suspended under 26 U.S.C. §6503(H) for tax periods being paid under the plan and terminates on the earlier of (1) all required payments to the IRS having been made; or (2) thirty (30) days after the date of the demand letter (described above) for which the Debtors failed to cure the default.

The debt owned by the Reorganizing Debtors to the IRS is a non-dischargeable debt, except as otherwise provided for in the Code.  The period of limitations on collection remains suspended

under 26 U.S.C. §6503(h) for tax periods being paid under the Plan and terminates on the earlier of (1) all required payments to the IRS have been made; or (2) thirty (30) days after the date of the demand letter (described above for which the Debtors failed to cure the default).

### C. United States Trustee Provision

The Reorganizing Debtors shall pay on the Effective Date all pre-confirmation quarterly fees owed to the United States Trustee.  The Reorganizing Debtors also shall timely pay post-confirmation quarterly fees assessed pursuant to pursuant to 28 U.S.C. § 1930 (a)(6) until such time as the Bankruptcy Court enters a final decree closing this Chapter 11, or enters an order either converting this case to a case under chapter 7 or dismissing this case.  After confirmation, the Reorganizing Debtors shall file with the Bankruptcy Court and shall transmit to the United States Trustee a true and correct statement of all disbursements made by the Reorganizing Debtors for each quarter, or portion thereof, that this Chapter 11 case remains open in format prescribed by the United States Trustee.

## XV.   LEASES AGREEMENTS AND EXECUTORY CONTRACTS

Any and all leases are hereby assumed.

## XVI.   PREFERENCES AND FRAUDULENT TRANSACTIONS

Debtors have reviewed all transactions within two (2) years prior to the commencement of this case, and do not believe preferences or fraudulent transfers exist that would benefit the estate or would have value to the estate.

## XVII.   LITIGATION, RETENTION OF CLAIMS AND CAUSES OF ACTION, AND REQUEST FOR RELIEF UNDER B.R. 9019

PSP has no pending litigation.   Tellez, however, has one pending lawsuit in state court which was assigned Cause No. 2013-CVT-000033-D3.  In this connection, suit was filed against

Tellez by Maria Del Carmen Sullivan, Individually and as Parent of Melissa Kathleen Sullivan, Minor for an accident that happened in Tellez's swimming pool.  Such suit is currently stayed.  All claims, causes of actions, judgments, offsets or other rights are hereby vested in the Reorganized Debtors.

By this Plan, Debtors are also requesting relief from the Bankruptcy Code pursuant to *Bankruptcy Rule 9019* to approve certain compromise between Debtors and Perez regarding Perez' unpaid rent in the aggregated amount of $40,700 as of January 2016.  In this connection, Perez has failed to pay rent to PSP since December 2012 through the filing of this Joint Amended Combined Disclosure Statement and Plan.   Debtors would like to avoid the costs associated with the collection of such unpaid rent and Perez has agreed to deduct the $39,600.00 and any future unpaid rent, plus 5.25% interest per annum, from Perez' equity in the Subject Property.  Perez has also agreed to deduct from his equity in the Subject Property any amount, plus 5.25% interest per annum, that he fails to contribute for the: (i) monthly installments due CFS under this Plan; (ii) monthly escrow installments due CFS under this Plan; (iii) payments of ad valorem taxes called for under this plan; (iv) payment of future ad valorem taxes; (v) payment of utilities; (vi) maintenance and repairs necessary to upkeep the Subject Property; and (vii) administrative fees incurred during the pendency of these cases.  This resolution secures that to the extent that Perez' failure to pay rent and/or to make the necessary monetary contributions adversely impacts this Plan, then the other Current Owners can freely contribute or infuse such deficit because the equity interests will be adjusted accordingly.  Notwithstanding the foregoing, the settlement agreement contained herein shall in no way modify the obligations of Vela, Perez or Tellez to CFS, and all three individual owners remain jointly and severally liable to CFS for the entire amount of the debt owed to CFS.  Based on the foregoing and pursuant to *Bankruptcy Rule 9019(a)*, PSP requests that this Honorable Court's approve the settlement agreement attached hereto as **Exhibit "D**.**"**

### XVIII. <u>ABSOLUTE PRIORITY RULE</u>

Because Debtors will not cram-down the unsecured creditors, the Absolute Priority Rule is inapplicable.

### XIX.     INJUNCTIVE RELIEF

Permanent Injunctive Relief is hereby sought against conduct not otherwise enjoined under the Bankruptcy Code.  Specifically, upon confirmation, the creditors of this estate shall be enjoined from taking any action against the Reorganized Debtors or against property of the Reorganized Debtors that is inconsistent with the terms of this plan not otherwise enjoined under the Bankruptcy Code.  Temporary Injunctive Relief is also hereby sought against conduct not otherwise enjoined under the Bankruptcy Code.  Specifically, upon confirmation, the creditors in this case may not attempt to collect or commence or continue any litigation against any co-debtor or anyone who has guaranteed any pre-petition debt unless the Reorganized Debtors default under this Plan.

### XX.     RETENTION OF POST-CONFIRMATION JURISDICTION

The Bankruptcy Court shall retain jurisdiction of this Chapter 11 case pursuant to and for the purpose set forth in Section 1127(b) of the Code and to:

1.     Determine the reasonable sales price of the Subject Property in the event that the Current Owners cannot reach an agreement and the reasonableness of the marketing efforts of the Subject Property;

2.     Resolve any disputes regarding the terms of this Plan; and

3.     Enforce this Plan.

### XXI.     PLEASE VOTE FOR THIS PLAN

Debtors ask Creditors to vote in favor of this Plan because it will allow them to pay all Creditors as provided herein and to effectively reorganize.

25

DATED:   February 25, 2016

PROFESSIONAL SERVICES PLAZA

By:*/s/Jose Salvador Tellez*_____
     Jose Salvador Tellez,
     Managing Partner


*/s/Jose Salvador Tellez*_____
Jose Salvador Tellez,
Debtor


*/s/Adolfo Campero, Jr.*_____
Adolfo Campero, Jr., Attorney for Debtors

26

**PROFESSIONAL SERVICES PLAZA**
**ASSETS AND LIQUIDATION ANALYSIS**

| Asset | Fair Market Value | Est. Liq. Value | Lienholder and Claim Amount | Est. Liq. Value for Unsecured |
|---|---|---|---|---|
| Cash on Hand | $5,070.65 | $5,070.65 | CFS Allocation Solutions, L.L.C. ("CFS") $421,557.77 (Est.) | $0.00 |
| Although the following property is titled under the Current Partners, PSP contends that it is the equitable owner of such property:<br><br>Lots 1 and 3, Block 231, WD, Laredo, Webb County, Texas, also known as 1102 Scott Street, Laredo, Texas 78041. | $847,000.00 | $794,457.00 | CFS $421,557.77 (Est.) | $372,899.23 |
| Accounts Receivable as of February 25, 2016 | $41,018.53 | $41,018.53 | CFS $421,557.77 (Est.) | $41,018.53 |
| (1) Desk; (1) Table (10) Chairs; (2) Coolers; and a Telephone System, which PSP estimates the value to be $1,500.00 | $1,500.00 | $1,200.00 | CFS $421,557.77 (Est.) | $1,200.00 |
|  |  |  |  |  |
| Gross Proceeds |  |  |  | $415,117.76 |
| Est. Liq. Costs |  |  |  | $26,595.80 |
| Est. Trustee Fees |  |  |  | $41,511.78 |
| Liq. Avail. For USC |  |  |  | $347,010.18 |
| Plan Avail. For USC |  |  |  | $8,413.00 |
| Allowed USC |  |  |  | $8,413.00 |

**EXHIBIT "A"**

## JOSE SALVADOR TELLEZ
## ASSETS AND LIQUIDATION ANALYSIS

| Asset | Fair Market Value | Est. Liq. Value | Lienholder and Claim Amount | Est. Liq. Value for Unsecured |
|---|---|---|---|---|
| Tellez believes that the Real Property listed above as being owned and held by PSP is correct, and thus Tellez has a 1/3 interest in PSP.<br><br>However, to the extent that the Court ultimately finds that PSP does not have an equitable ownership interest in the subject real property, then in the alternative, Tellez owns a 1/3 interest in the following real property:<br><br>Lots 1 and 3, Block 231, WD, Laredo, Webb County, Texas, also known as 1102 Scott Street, Laredo, Texas 78041. | $282,333.33 | $225,866.66 | CFS Allocation Solutions, L.L.C. ("CFS") $225,866.66 | $0.00 |
| State Bar Licesnes | $0.00 | $0.00 | N/A | $0.00 |
| 2005 Ford F-150 | $5,904.00 | $4,723.20 | I.R.S. $67,386.93 | $43,638.75 |
| 1997 Chevrolet Camaro | $3,705.00 | $2,964.00 | | |
| Sole Proprietor Law Practice | $175,529.50 | $87,764.75 | | |
| Cash on Hand | $15,573.73 | $15,573.73 | | |
| | | | | |
| Gross Proceeds | | | | $43,638.75 |
| Est. Liq. Costs | | | | $4,363.88 |
| Es. Trustee Fees | | | | $4,363.88 |
| Liq. Avail. For USC | | | | $34,910.99 |
| Plan Avail. For USC | | | | $36,998.29 |
| Allowed USC | | | | $36,998.29 |

**EXHIBIT "A-1"**

# PROFESSIONAL SERVICES PLAZA
## 2016 BUDGET

| INCOME | Amount |
|---|---|
| Tenants Under Contract | 71,316.96 |
| Project New Tenants | 48,683.04 |
| | |
| | |
| | |
| | |
| | |
| **Total** | **120,000.00** |

| EXPENSES | Amount |
|---|---|
| Payroll | 13,704.60 |
| Taxes (Payroll/Franchise/Tex. Comp.) | 2,138.40 |
| Utilities | 19,031.88 |
| Maintenance/Repairs/Pest Control | 10,900.00 |
| Insurance | 6,273.12 |
| Ad Valorem Taxes | 14,362.68 |
| Bookkeeping/Professional Fees | 1,500.00 |
| Mic | 434.29 |
| Plan Payments | 51,163.75 |
| **Total** | **119,508.72** |

| TOTALS/SURPLUS | |
|---|---|
| TOTAL INCOME | 120,000.00 |
| TOTAL EXPENSES | 119,508.72 |
| SURPLUS | 491.28 |

**Exhibit B**

# LAW OFFICES OF JOSE SALVADOR TELLEZ
## 2016 BUDGET

| INCOME | Amount |
|---|---|
| Law Practice | 431,335.56 |
| | |
| | |
| | |
| | |
| | |
| **Total** | **431,335.56** |

| EXPENSES | Amount |
|---|---|
| Payroll | 92,758.32 |
| Taxes (Payroll/Franchise/Tex. Comp.) | 13,913.76 |
| Utilities | 14,610.48 |
| Maintenance/Repairs/Pest Control | |
| Insurance | 22,501.48 |
| CLE & Subscriptions | 17,199.96 |
| Storage Fees | 3,000.00 |
| Parking/Licesne/Registration Fees | 504.00 |
| Gasoline | 7,800.00 |
| Advertisement | 588.00 |
| Maintenance | 6,420.00 |
| Office Supplies | 2,250.00 |
| Postage/FedEx | 23,400.00 |
| **Total** | **204,946.00** |

| TOTALS/SURPLUS | |
|---|---|
| TOTAL INCOME | 431,335.56 |
| TOTAL EXPENSES | 204,946.00 |
| SURPLUS/PERSONAL INCOME | 226,389.56 |

**EXHIBIT B-1**

# JOSE SALVADOR TIJERINA
## 2015-2016 FISCAL BUDGET (Revised)

| INCOME | Amount |
|--------|--------|
| Salary | 226,389.56 |
| | |
| | |
| | |
| | |
| | |
| **Total** | **226,389.56** |

| EXPENSES | Amount |
|----------|--------|
| Home Maintenance | 13,920.00 |
| Light | 4,800.00 |
| Water/Sewer/Garbage | 2,364.00 |
| Phone/Internet/Cable | 6,240.00 |
| Food/Housekeeping/Supplies | 6,240.00 |
| Clothing/Loundary/Dry Cleaning | 2,499.96 |
| Personal Care Pruducts/Services | 900.00 |
| Medical/Dental | 250.00 |
| Transportation | 3,600.00 |
| Entertainment | 7,800.00 |
| Charitable Contributions | 1,040.04 |
| Life Insurance | 25,200.00 |
| Plan Payments | 49,346.16 |
| **Total** | **124,200.16** |

| TOTALS/SURPLUS | |
|----------------|--------|
| TOTAL INCOME | 226,389.56 |
| TOTAL EXPENSES | 124,200.16 |
| SURPLUS/ATTORNEY/TRUSTEE FEES | 102,189.40 |

**EXHIBIT B-2**

PROFESSIONAL SERVICES PLAZA/JOSE SALVADOR TELLEZ
COMBINED 12 MONTH CASH FLOW FORECAST CUMULATIVE PLAN SUMMARY
FOLLOWING EFFECTIVE DATE

| | March 2016 | April 2016 | May 2016 | June 2016 | July 2016 | Aug. 2016 | Sept. 2016 | Oct. 2016 | Nov. 2016 | Dec. 2016 | Jan. 2016 | Feb. 2016 | 12 Month Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Estimated Cash Received from Operations:** | | | | | | | | | | | | | |
| PSP Income | 9,424.12 | 9,424.12 | 9,424.12 | 9,424.12 | 9,424.12 | 9,424.12 | 9,424.12 | 9,424.12 | 9,424.12 | 9,424.12 | 9,424.12 | 9,424.12 | $ 113,089.44 |
| Tellez Law Office Income | 35,944.63 | 35,944.63 | 35,944.63 | 35,944.63 | 35,944.63 | 35,944.63 | 35,944.63 | 35,944.63 | 35,944.63 | 35,944.63 | 35,944.63 | 35,944.63 | $ 431,335.56 |
| Total Income | $45,368.75 | $45,368.75 | $45,368.75 | $45,368.75 | $45,368.75 | $45,368.75 | $45,368.75 | $45,368.75 | $45,368.75 | $45,368.75 | $45,368.75 | $45,368.75 | $ 544,425.00 |
| **PSP Expenses** | | | | | | | | | | | | | |
| Tellez Law Office & Personal Expenses | 5,897.25 | 5,897.25 | 5,897.25 | 5,897.25 | 5,897.25 | 5,897.25 | 5,897.25 | 5,897.25 | 5,897.25 | 5,897.25 | 5,897.25 | 5,897.25 | $ 70,766.97 |
| Total Expenses | 23,129.17 | 23,129.17 | 23,129.17 | 23,129.17 | 23,129.17 | 23,129.17 | 23,129.17 | 23,129.17 | 23,129.17 | 23,129.17 | 23,129.17 | 23,129.17 | $ 277,550.00 |
| | 29,026.41 | 29,026.41 | 29,026.41 | 29,026.41 | 29,026.41 | 29,026.41 | 29,026.41 | 29,026.41 | 29,026.41 | 29,026.41 | 29,026.41 | 29,026.41 | $ 348,316.97 |
| | | | | | | | | | | | | | |
| Est. Surplus | 16,342.34 | 16,342.34 | 16,342.34 | 16,342.34 | 16,342.34 | 16,342.34 | 16,342.34 | 16,342.34 | 16,342.34 | 16,342.34 | 16,342.34 | 16,342.34 | $196,108.03 |
| Est. Cash Infusion | 47,693.59 | | | | | | | | | | | | $47,693.59 |
| Est. Funds For Effective Date | 64,035.53 | | | | | | | | | | | | $64,035.53 |
| | | | | | | | | | | | | | |
| U.S. Trustee Fees | | | | | | | | | | | | | |
| Estimated Professional Fees | | | | | | | | | | | | | |
| CLASS 1.  Claims of CFS | 1,600.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $ 1,600.00 |
| CLASS 2.  Secured Claim of COJ | 2,810.00 | $2,810.00 | $2,810.00 | $2,810.00 | $2,810.00 | $2,810.00 | $2,810.00 | $2,810.00 | $2,810.00 | $2,810.00 | $2,810.00 | $2,810.00 | 45,000.00 |
| CLASS 3.  Secured Claim of VXC | $3,389.71 | $166.00 | $166.00 | $166.00 | $166.00 | $166.00 | $166.00 | $166.00 | $166.00 | $166.00 | $166.00 | $166.00 | 33,720.00 |
| CLASS 4.  Secured Claim of CCC | $2,424.61 | $240.00 | $240.00 | $240.00 | $240.00 | $240.00 | $240.00 | $240.00 | $240.00 | $240.00 | $240.00 | $240.00 | 5,415.71 |
| CLASS 5.  Secured Claim of USD | $2,675.22 | $49.00 | $49.00 | $49.00 | $49.00 | $49.00 | $49.00 | $49.00 | $49.00 | $49.00 | $49.00 | $49.00 | 5,064.61 |
| CLASS 6.  Priority Claim of IRS | 175.00 | $175.00 | $175.00 | $175.00 | $175.00 | $175.00 | $175.00 | $175.00 | $175.00 | $175.00 | $175.00 | $175.00 | 2,363.21 |
| CLASS 7.  Secured Claim of IRS | 1,225.00 | $1,225.00 | $1,225.00 | $1,225.00 | $1,225.00 | $1,225.00 | $1,225.00 | $1,225.00 | $1,225.00 | $1,225.00 | $1,225.00 | $1,225.00 | 4,690.22 |
| CLASS 8.  Secured Claim of TMCC | 1,210.85 | $1,210.85 | $1,210.85 | $1,210.85 | $1,210.85 | $1,210.85 | $1,210.85 | $1,210.85 | $1,210.85 | $1,210.85 | $1,210.85 | $1,210.85 | 14,700.00 |
| CLASS 9.  Secured Claim of AFI | 121.06 | $121.06 | $121.06 | $121.06 | $121.06 | $121.06 | $121.06 | $121.06 | $121.06 | $121.06 | $121.06 | $121.06 | 14,530.20 |
| CLASS 10.  Secured Claim of GT | 160.00 | $160.00 | $160.00 | $160.00 | $160.00 | $160.00 | $160.00 | $160.00 | $160.00 | $160.00 | $160.00 | $160.00 | 1,452.72 |
| CLASS 11.  Tellez Unsecured Claims | 644.32 | $644.32 | $644.32 | $644.32 | $644.32 | $644.32 | $644.32 | $644.32 | $644.32 | $644.32 | $644.32 | $644.32 | 1,920.00 |
| CLASS 12.  PSP Unsecured Claims | 605.36 | $605.36 | $605.36 | $605.36 | $605.36 | $605.36 | $605.36 | $605.36 | $605.36 | $605.36 | $605.36 | $605.36 | 7,731.84 |
| CLASS 13.  Equity Holders | 145.59 | $145.59 | $145.59 | $145.59 | $145.59 | $145.59 | $145.59 | $145.59 | $145.59 | $145.59 | $145.59 | $145.59 | 7,264.32 |
| | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 1,747.08 |
| Total Payments Made under Proposed Pl | $64,035.53 | $7,552.18 | $7,552.18 | $7,552.18 | $7,552.18 | $7,552.18 | $7,552.18 | $7,552.18 | $7,552.18 | $7,552.18 | $7,552.18 | $7,552.18 | $ 147,109.91 |

EXHIBIT "C"

## SETTLEMENT AGREEMENT

The parties to this Settlement Agreement (**"Agreement"**) are Debtor, Professional Services Plaza (**"Debtor"**), and Eustorgio Perez (**"Perez"**).  The parties referenced above are hereinafter sometimes collectively referred to as the "Parties" and each of them is hereinafter sometimes individually referred to as "Party."

## R E C I T A L S:

The Parties enter into this Agreement based upon the following facts, intentions and understandings:

A. Debtor is a partnership by the name of Professional Services Plaza ("PSP") which was established under the law of Texas by Jose Salvador Tellez, Eustorgio Perez, Jorge O. Gutierrez, and Jose Vela, Jr. in 1989.  The PSP General Partners acquired in their names a certain tract of real property and certain improvements located at 1102 Scott Street, Laredo, Webb County, Texas 78040 (the "Subject Property").  The Partners intended that PSP own the Subject Property and believed that it being titled under their names evidenced that PSP was the owner.  Nevertheless, because PSP has managed all affairs of the Subject Property and paid all debt service, ad valorem taxes, paid for improvements, and paid for other expenses associated with the Subject Property, PSP has acquired an equitable interest in the Subject Property.  Importantly, on or about November 11, 1999, Jose Vela, III, the son of Jose Vela, Jr., acquired his father's interest in Debtor.  Thereafter, to stop a foreclosure of the Subject Property, and to allow Debtor to restructure its debts, Debtor filed for Chapter 11 Bankruptcy on March 2, 2015, under Cause No. 15-50024; *In re Professional Services Plaza;*, In the United States Bankruptcy Court for the Southern District of Texas, Laredo Division.  Debtor claims that Perez owes past due rent in the total aggregate amount of $40,700.00 as of January 2016(the "Unpaid Rent").  Perez, however, is currently unable to pay the Unpaid Rent and, therefore, would require Debtor to initiate litigation for collection of same.

B. Pursuant to the agreement reached between Debtors, Jose Vella III, Perez, and CFS Allocation Solutions, L.L.C., title will remain under the Tellez, Perez, and Vela and PSP will renounces any interest that it has claimed of having in the Subject Property during the pendency of the Chapter 11 cases.

## EXHIBIT "D"

4852-4000-5401.1

C.   Except to establish that Perez owes Debtors the amount of $41,800.00 for the Unpaid Rent as of the date of February 2016, neither this Agreement nor any of its terms, covenants, or conditions shall be offered or received in evidence in any proceeding or utilized in any matter whatsoever as an admission of any other wrongdoing of any nature or any other liability therefore on the part of Debtor or Perez, provided, however, that nothing contained in this paragraph shall prevent this Agreement from being used, offered or received in evidence in any proceeding to enforce or otherwise effectuate the terms of the settlement agreement or to evidence that Debtors and Perez agreed to establish the partnership known as PSP in 1989 and have continued to have the intent that PSP own at least an equitable interest in the subject real property and improvements and manage and operate all aspects of the business affairs of the real property, which is used as an office complex that generates rental revenues and incurs related expenses and accrues debt service and ad valorem tax obligations and liabilities.

D.   It is further understood and agreed that this settlement is a compromise of the claims and defenses, and compulsory counterclaims, which could have been asserted in a lawsuit between Debtor and Perez for the collection of the Unpaid Rent.

NOW, THEREFORE, in consideration of the promises and the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## AGREEMENTS

1.   <u>EFFECTIVE DATE</u>.  This Agreement shall become effective as of the date when all Parties have executed this Agreement.

2.   <u>RECITALS INCORPORATED</u>.   The recitals and prefatory phrases and paragraphs set forth above are hereby incorporated in full, and made a part of, this Agreement.

3.   <u>SETTLEMENT</u>.  In full satisfaction of the liability for Unpaid Rent, Perez hereby agrees to deduct the amount of the Unpaid Rent, plus 5% interest per annum, from his equity in the Subject Property.  Perez has also agreed to deduct from his equity in the Subject Property any amount, plus 5.25% interest per annum, that he fails to contribute: (i) for the adequate protection and escrow payments during the pendency of the Chapter 11 cases; (ii) for the monthly installments due CFS under the Debtor's Joint Chapter 11 Plan; (iii) for the monthly escrow installments due CFS under Debtor's Chapter 11 Plan; (iv) for the payments of ad valorem taxes called for under Debtor's Chapter 11 Plan; (v) for all future ad valorem taxes; (vi) for the utilities payments; (vii) for any maintenance and repairs necessary to upkeep the Subject Property; and (viii) to pay on the Effective Date the administrative fees incurred during the pendency of the

4852-4000-5401.1

2

Chapter 11 cases.  Regarding the administrative fees/attorney's fees, the Current Owners agree that 2/3rds shall be to PSP and 1/3rd to Tellez.    To the extent that there is an increase in the balance of the Unpaid Rent after the date of this agreement, then such increase shall be treated in the same manner as the amount that has accrued as of the date hereof.

4. <u>FEES, COSTS, AND EXPENSES</u>.  The Parties agree to bear their own attorneys' fees, costs and expenses in connection with this matter.

5. <u>REPRESENTATIONS</u>.   The Parties acknowledge, represent, warrant, confirm and agree as follows:

a. The execution of this Agreement is not based upon any representation, understanding or agreement not expressly set forth herein.  No Party nor its/his counsel has made any representations to any Party not expressly set forth herein;

b. Each Party executes this Agreement as a free and voluntary act, without any duress, coercion or undue influence exerted by or on behalf of any other Party;

c. Acceptance of this Agreement or any act related hereto is in no way an admission of any fault or liability by any Party hereto;

d. This Agreement constitutes the entire settlement agreement between the Parties hereto.  This Agreement embodies the entire agreement with respect to the respective rights, obligations and liabilities of the Parties hereto and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof;

e. Each Party has full and complete authorization and power to execute this Agreement in the capacity herein stated and this Agreement is a valid, binding and enforceable obligation and does not violate any law, rule, regulation, contract or agreement otherwise enforceable by or against either Party; and

f. This Agreement is subject to approval by the Bankruptcy Court in Cause No. 15-50024; *In re Professional Services Plaza;*, In the United States Bankruptcy Court for the Southern District of Texas, Laredo Division.

6. <u>TITLE TO THE SUBJECT PROPERTY</u>.  <u>Perez agrees that upon presentation of a quitclaim deed, he shall convey any and all right, title, and interest he has in the Subject Property to Debtor.</u>

7. <u>MULTIPLE ORIGINALS</u>.   This Agreement may be executed in multiple originals.

8. <u>SUCCESSORS AND ASSIGNS</u>.  This Agreement shall become effective as specified in Paragraph 1 hereof and thereafter shall be binding upon and inure to the benefit of the respective Parties hereto and their respective predecessors, successors, heirs, legal representatives, administrators, attorneys, executors and assigns, as well as their agents, servants, employees, and affiliates, and all persons, either natural or corporate, in privity with either of them.

4852-4000-5401.1

9.      APPLICABLE LAW; VENUE.    This Agreement shall be governed by and construed in accordance with the laws of the State of Texas and the applicable laws of the United States of America.  This Agreement has been entered into in Webb County, Texas, and shall be performable for all purposes in Webb County, Texas.  State or federal courts within the State of Texas shall have jurisdiction over any and all disputes arising under or pertaining to this Agreement, and venue in any such dispute shall be had in Webb County or in the federal court in which that county is located.

10.      SURVIVAL OF REPRESENTATIONS AND WARRANTIES.      All representations and warranties made in this Agreement shall survive its execution and delivery.

11.      SEVERABILITY.  Any provision of this Agreement held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Agreement and the effect thereof shall be confined to the provision held to be invalid or illegal. It is expressly agreed by the Parties that each, every and all terms and provisions of this agreement are contractual in nature and not merely recitals.

12.      FULL DISCLOSURE.   The Parties hereby warrant and represent that before executing this Agreement, they have fully informed themselves of its terms, contents, and conditions (in effect that no promise or representation of any kind has been made by either Party, except as is expressly stated in this Agreement) and that they have had the opportunity to seek and have sought and received the advice of their respective legal counsel (which legal counsel is and has been familiar with their respective positions and business, generally) before entering into this Agreement, and that they fully understand the terms and provisions hereof.

13.      NO WAIVER.    The provisions of this Agreement may not be changed, discharged, terminated, altered or waived orally, but only by an instrument in writing signed by the Parties hereto.

14.      CONSTRUCTION OF AGREEMENT.   This Agreement shall be deemed as having been drafted by both Parties to it so that any rule of construction construing ambiguities against the drafter shall have no force or effect.

15.      HEADINGS.    The paragraph headings in this Agreement are for reference purposes only and are not intended in any way to describe, interpret, define or limit the extent or intent of this Agreement or of any part hereof.

16.      NO ADMISSION OF LIABILITY.   Other than Perez acknowledging that he owes the balance of the Unpaid Rent, the Parties acknowledge that, each of them respectively, deny any other liability whatsoever, and that this Agreement has been executed in connection with the compromise and settlement of all claims related to the subject matter of the Lawsuit, whether known or unknown. .  This Agreement and the actions taken pursuant hereto do not constitute an acknowledgment or admission on the part of the respective Parties, or any of them, of liability for any matter alleged, or which could have been alleged, related to this matter.

17.      FULL CAPACITY.  The Parties respectfully represent that the below signatories have full mental capacity and legal authority to enter into, execute and perform this Agreement,

4852-4000-5401.1

4

and that they had a full and complete opportunity to consult with counsel before signing the Agreement. The Parties are the sole and lawful owner of all claims being settled herein. Neither Party has assigned or transferred any of the claims released herein to any other person or entity not bound by this Agreement.

18.     ENTIRE AGREEMENT. This Agreement, upon its effectiveness in accordance with Paragraph 1 above, shall constitute the entire agreement of the Parties with respect to the matters contained herein and shall supersede and replace all previous agreements, whether written or oral, relating to such matters. THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

19.     CONFIRMATION OF KNOWINGLY AND VOLUNTARILY ENTERING INTO THE SETTLEMENT.   The Parties hereto further warrant that they have read this Agreement and fully understand it to be a compromise settlement agreement that is effective upon completion of all terms and conditions of this Agreement. This Agreement is executed voluntarily and without any duress or undue influence on the part or on behalf of the Parties hereto. The Parties each represent, warrant, and acknowledge that they:

a.     are completely informed of the facts relating to the subject matter of this Agreement and of the rights and liabilities of all Parties;

b.     enter into this Agreement voluntarily after receiving the advice of independent counsel;

c.     have given careful and mature thought to the making of this Agreement;

d.     have carefully read each and every provision of this Agreement;

e.     completely understands the provisions of this Agreement, concerning both the subject matter and the legal effect;

f.     stipulate this Agreement to be just and right;

g.     state that this Agreement was signed without any coercion, any duress, or any agreement other than those specifically set forth in this Agreement; and

h.     prior to executing this instrument, have fully informed themselves of the terms and contents of this Agreement.

**IN WITNESS WHEREOF**, the Parties hereto have duly executed this Agreement on the dates indicated below in multiple originals.

4852-4000-5401.1

Date:_____                PROFESSIONAL SERVICES PLAZA.

By:_____

Name:_____

Title:_____

THE STATE OF TEXAS          §
                            §
COUNTY OF WEBB              §

    This instrument was acknowledged before me on this _____ day of _____,
2015, by Jose Salvador Tellez, as managing partner for Professional Services Plaza.


_____
NOTARY PUBLIC
STATE OF _____

Date:_____          _____
                                       EUSTORGIO PEREZ


THE STATE OF TEXAS          §
                            §
COUNTY OF WEBB              §

    This instrument was acknowledged before me on this _____ day of _____,
2015, by Eustorgio Perez.


_____
NOTARY PUBLIC
STATE OF _____

4852-4000-5401.1

6